JUDGE SCHEINDLIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x

MOIRA MELTZER-COHEN,

                        Plaintiff,

              -v-

THE CITY OF NEW YORK, New York City Police
Department Officer ("P.O.") ARTUR BERNADSKIY
(Shield No. 6571), P.O. JOHN DOE (the name "John
Doe" being fictitious, as the true name and shield
number are not presently known), in their individual
capacities,

                        Defendants.

-------------------------------------------------------------------x

**COMPLAINT AND DEMAND
FOR A JURY TRIAL**

Index No. 14-CV- _____

ECF Case



Plaintiff MOIRA MELTZER-COHEN, through her attorney Robert M. Quackenbush of

Rankin & Taylor, PLLC, as and for her complaint, does hereby state and allege:

## PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth, and

   Fourteenth Amendments of the Constitution of the United States, through the Civil Rights

   Act of 1871, *as amended*, codified as 42 U.S.C. § 1983.

2. Plaintiff MOIRA MELTZER-COHEN's rights were violated when officers of the NEW

   YORK CITY POLICE DEPARTMENT ("NYPD") unconstitutionally and without any legal

   basis arrested her and caused her to be prosecuted on a bogus charge. By reason of

   defendants' actions, including their unreasonable seizure and malicious prosecution, Ms.

   MELTZER-COHEN was deprived of her constitutional rights.

3. Ms. MELTZER-COHEN also seeks an award of compensatory and punitive damages and

   attorneys' fees.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 for violations of the First, Fourth, and Fourteenth Amendments to the Constitution of the United States.

5. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) in that plaintiff's claim arose in the Southern District of New York.

6. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

**PARTIES**

7. Plaintiff MOIRA MELTZER-COHEN is, and was at all times relevant to this action, a resident of the County of Kings in the State of New York.

8. On October 10, 2011, the date of the incident described herein, Ms. MELTZER-COHEN was a student at, and the student body president of, the City University of New York's School of Law.

9. Ms. MELTZER-COHEN is a member in good standing of the New York State Bar.

10. Other than the arrest here at issue, Ms. MELTZER-COHEN has never been arrested.

11. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. The CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

12. Defendants NYPD Officer ("P.O.") ARTUR BERNADSKIY (Shield No. 6571) and P.O. JOHN DOE (the name "John Doe" being fictitious, as the true name and shield number are

not presently known) (referred to collectively as the "officer-defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.

13. Upon information and belief, at the time of the incident described herein, the officer-defendants were assigned to the NYPD's Fifth Precinct, located at 19 Elizabeth Street, New York, New York.

14. The true name and shield number of defendant P.O. DOE is not currently known to the plaintiff. However, upon information and belief, he was an employee or agent of the NYPD on October 10, 2011, the date of the incident described herein. Accordingly, P.O. DOE may be entitled to representation in this action by the New York City Law Department ("Law Department") upon his request, pursuant to General Municipal Law § 50-k. The Law Department, then, is hereby put on notice (a) that Ms. MELTZER-COHEN intends to name P.O. DOE as defendant in an amended pleading once the true name and shield number of P.O. DOE become known to Ms. MELTZER-COHEN and (b) that the Law Department should immediately begin preparing P.O. DOE's defense in this action.

15. The officer-defendants are being sued in their individual capacities.

16. At all times relevant herein, the officer-defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

17. The officer-defendants' acts hereafter complained of were carried out intentionally,

recklessly, with malice, and in gross disregard of Ms. MELTZER-COHEN's rights.

18. At all relevant times, the officer-defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

19. Ms. MELTZER-COHEN was falsely arrested by the officer-defendants on October 10, 2011 at approximately 3:30 a.m. in Kimlau Square near the intersection of Bowery and Worth Street, located just east of NYPD headquarters at One Police Plaza.

20. On the afternoon and evening of October 9, 2011, Ms. MELTZER-COHEN was acting in her capacity as a trained National Lawyers Guild Legal Observer, as identified by her bright green hat embroidered in black thread with the words "National Lawyers Guild Legal Observer" and the Legal Observer identification card worn around her neck that hung in front of her chest. Ms. MELTZER-COHEN is one of many legal observers who volunteered their time at rallies organized by the Occupy Wall Street ("OWS") movement since its inception in September 2011.[1]

21. On the afternoon and evening of October 9, 2011, approximately 88 demonstrators associated with the OWS movement were arrested in the vicinity of Times Square. NYPD officers took these arrestees to One Police Plaza for processing.

---

[1]     The nationwide National Lawyers Guild Legal Observer program, established in New York City in 1968 in response to policing practices at antiwar and civil rights demonstrations, is part of the progressive bar association's ongoing commitment to advance and protect civil rights.

In New York City, police officers are familiar with the National Lawyers Guild Legal Observer program because Legal Observers and their green hats are present at many demonstrations. Legal Observers, when requested by demonstration organizers, attend demonstrations to document law enforcement conduct, including arrests, and their presence often discourages acts of police officers and other persons that would interfere with the demonstrators' free exercise of their constitutionally protected political views.

Ms. MELTZER-COHEN has been a regular Legal Observer in New York City since she was trained in late summer of 2011.

22. Around midnight, approximately 12 demonstrators were arrested in the vicinity of Washington Square Park. Like the Times Square arrestees, the Washington Square Park arrestees were also taken to One Police Plaza for processing.

23. After acting as a Legal Observer at both Times Square and Washington Square Park, Ms. MELTZER-COHEN went to Liberty Plaza (a.k.a. Zuccotti Park). There, Ms. MELTZER-COHEN received reports that several of the arrestees leaving One Police Plaza were bloodied or otherwise injured.

24. Ms. MELTZER-COHEN proceeded to One Police Plaza to perform "jail support" for the arrestees.[2]

25. As Ms. MELTZER-COHEN walked towards One Police Plaza, she approached a police officer leaning up against the iconic red steel sculpture, called "5 in 1," between One Centre Street and One Police Plaza.[3]

26. Ms. MELTZER-COHEN told the officer, in sum and substance, that she was there to do jail support and asked where she should go. In response, the officer told her, in sum and substance, jail support "goes to the park in the back" and pointed towards One Police Plaza.

27. Following those directions, Ms. MELTZER-COHEN walked towards One Police Plaza and tried to figure out the quickest way to get around the building and to the park.

28. For that reason, Ms. MELTZER-COHEN approached the booth outside of One Police Plaza and asked the officer – an Officer Reed – where she should go to do jail support for the arrestees.

---

[2]      Jail support, in this case coordinated by the National Lawyers Guild, involves greeting people upon their release from detention after a mass arrest, to provide legal, medical, and social support. This ensures that arrestees understand their legal rights, resources, and responsibilities, and helps the legal process go smoothly for all parties. Members of the National Lawyers Guild believe jail support serves to mitigate the potential chilling effects of mass arrests on activity protected by the First Amendment.

[3]      For photos of and information about "5 in 1," please see http://tonyrosenthal.com/5IN1.htm.

29. In response, Officer Reed told her to walk around One Police Plaza and, in sum and substance, to "go down Worth and you'll see the park."

30. Ms. MELTZER-COHEN followed Officer Reed's instructions but was unable to find the park. Accordingly, Ms. MELTZER-COHEN approached a security booth, upon information and belief, on Park Row in order to get directions.

31. The officer inside the security booth informed Ms. MELTZER-COHEN that the arrestees were in the process of being released and that she should wait for them in Kimlau Square. The officer then pointed towards Kimlau Square and directed Ms. MELTZER-COHEN to wait there.

32. At approximately 1:30 a.m., Ms. MELTZER-COHEN walked into Kimlau Square and spoke with some of the arrestees who had been released.

33. For the next two hours, Ms. MELTZER-COHEN performed jail support by speaking with arrestees who came out of One Police Plaza, many of whom were injured and required medical attention. During that time, Ms. MELTZER-COHEN, *inter alia*, explained the legal process to the arrestees and assisted a nurse and an OWS medic in triaging the injured demonstrators.

34. Around 3:30 a.m., some of the demonstrators and released arrestees began showing Ms. MELTZER-COHEN video of some of the police violence which had taken place in Times Square and Washington Square Park.

35. While Ms. MELTZER-COHEN was viewing the video, an NYPD van rolled over the sidewalk and entered Kimlau Park.

36. The officer-defendants – P.O. BERNADSKIY and P.O. DOE – got out of the van, approached Ms. MELTZER-COHEN, and demanded that she produce identification.

37. Ms. MELTZER-COHEN asked why she was being ordered to produce her identification and explained that she was doing jail support for the OWS arrestees inside One Police Plaza.

38. Ms. MELTZER-COHEN also told the officer-defendants, in sum and substance, "I was told by other officers to be here," and pointed towards the female officer in the security booth on Park Row. She also told the officer-defendants to check with that officer in the security booth to confirm.

39. One of the officer-defendants then grabbed Ms. MELTZER-COHEN, and the other officer-defendant told her, in sum and substance, "WE WANNA SEE YOUR I.D."

40. The officer-defendants rear-cuffed Ms. MELTZER-COHEN and placed her into the NYPD van, without giving her a reasonable opportunity to produce the identification as requested.

41. The officers did not arrest anyone else standing inside Kimlau Square.

42. En route to the precinct stationhouse, the officer-defendants mocked Ms. MELTZER-COHEN and told her, in sum and substance, "WHY DID YOU LISTEN TO THE COPS WHO TOLD YOU TO STAND THERE? THEY DON'T HAVE JURISDICTION. THIS IS THE FIFTH PRECINCT. THEY DON'T HAVE JURISDICTION TO TELL YOU WHERE TO STAND."

43. Upon arrival to the Fifth Precinct stationhouse, the officer-defendants took Ms. MELTZER-COHEN – still wearing her green Legal Observer hat – inside and approached the front desk. The desk officer looked at Ms. MELTZER-COHEN and said to the officer-defendants, "What is this person doing here? This person has pigtails."

44. A female officer then searched through Ms. MELTZER-COHEN's bag and pulled out numerous fliers promoting CUNY School of Law, where Ms. MELTZER-COHEN was the student body president.

45. Ms. MELTZER-COHEN was then cuffed to a bench. She asked the officer-defendants why they had arrested her.

46. In response, one of the officers said, "FOR BEING A BAD LAW STUDENT" and then "FAILURE TO SHOW I.D."

47. Eventually, one of the officer-defendants stated, in sum and substance, "WE'RE GONNA CHARGE YOU WITH AN UNDIFFERENTIATED NOT OTHERWISE SPECIFIED UNCLASSIFIED MISDEMEANOR."

48. Upon hearing this explanation, the other officer-defendant stated, "YEAH, WHAT HE SAID."

49. P.O. BERNADSKIY issued Ms. MELTZER-COHEN a criminal court summons which charged her with violating 56 RCNY 1-03(c)(2).

50. The provision at issue, 56 RCNY 1-03(c)(2), states that "[n]o person shall fail to comply with or obey any instruction, direction, regulation, warning, or prohibition, written or printed, displayed or appearing on any park sign, except such sign may be disregarded upon order by a Police Officer or designated Department employee."

51. She was released from custody around 4:45 a.m. and attempted to walk back to Kimlau Square to continue jail support. The walk through the Bowery at that hour of the night, however, was harrowing to Ms. MELTZER-COHEN as the streets and sidewalks were full of many unfriendly, drunk and sometimes aggressive men performing acts that were *actually* criminal in nature – as opposed to the conduct for which Ms. MELTZER-COHEN was arrested. Combined with her exhaustion from the late hour and the stress of being arrested, Ms. MELTZER-COHEN got lost and was forced to take a cab to Kimlau Square.

52. On January 3, 2012, Ms. MELTZER-COHEN appeared in court as directed and was arraigned on the above charge.

53. The factual allegations allegedly supporting the charge, sworn to by P.O. BERNADSKIY, stated, "At T/P/O P.O. obs Deft in park name Kimlau park sign states park closed at dusk."

54. The officer-defendants were aware that other officers had directed Ms. MELTZER-COHEN to stand in Kimlau Square to do jail support – thereby falling within the clear exception to the provision at issue.

55. In any event, Ms. MELTZER-COHEN's criminal defense attorney submitted a written motion to dismiss the charge.

56. The District Attorney chose not to oppose the motion, and the charge was thereafter dismissed.

57. As a result of the incident, Ms. MELTZER-COHEN was deprived of her liberty and was humiliated – and felt a sense of deep failure – by being arrested in front of the very people she was counseling about the legal process.

58. Further, her admission to the New York State Bar was complicated by the existence of the arrest, notwithstanding the dismissal of the charge. In fact, during her interview with the Bar's Character and Fitness Committee, the interviewer exclaimed "You're my Occupy Wall Street arrest!" as soon as Ms. MELTZER-COHEN walked in the door, causing profound anxiety about whether she would be permitted to pursue the career for which she was trained and qualified.

## FIRST CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983
### (*Against the Officer-Defendants*)

59. Ms. MELTZER-COHEN incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

60. The officer-defendants, under color of state law, subjected the Ms. MELTZER-COHEN to the foregoing acts and omissions, thereby depriving her of her rights, privileges and immunities secured by the First, Fourth and Fourteenth Amendments to the United States Constitution, including, without limitation deprivation of the following constitutional rights: (a) freedom from unreasonable seizure of her person, including false arrest and false imprisonment, against both officer-defendants; (b) freedom from the lodging of false charges against her by a police officer, against P.O. BERNADSKIY; (c) freedom from having a police officer fabricate evidence against her, against P.O. BERNADSKIY; (d) freedom from malicious prosecution by police, against P.O. BERNADSKIY; and (e) freedom from retaliatory arrest and retaliatory prosecution, against both officer-defendants.

61. The officer-defendants' deprivation of Ms. MELTZER-COHEN's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983
### (*Against THE CITY OF NEW YORK*)

62. Ms. MELTZER-COHEN incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

63. All of the acts and omissions by the officer-defendants described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the

time of the conduct alleged herein and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

64. The CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified the officer-defendants' wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

65. The acts complained of were carried out by the aforementioned officer-defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

66. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

   a. Arresting Legal Observers, as documented in the following civil rights actions filed against the CITY:

      i. Treffs v. City of New York, 12-cv-3030 (HB) (KNF) (S.D.N.Y.) (officers arrest Legal Observer while observing and documenting the mass arrest of demonstrators associated with the Occupy Wall Street movement);

      ii. Wheeler v. City of New York, 07-cv-3999 (LBS) (S.D.N.Y.) (police officer grabs Legal Observer's bicycle chain she wears about her torso in order to pull her off her bicycle and uses chain to throw Legal Observer around, causing her to suffer injuries; and Legal Observer is brought to precinct, but released without charges filed against her)

      iii. Rankin v. City of New York, 06-cv-0362 (KMK) (S.D.N.Y.) (police officer pulls Legal Observer off his bicycle, arrests and swears out false complaint against him during Republican National Convention demonstration in 2004);

      iv. Garbini v. City of New York, 05-cv-1565 (KMK) (S.D.N.Y.) (during lawful demonstration, police officers indiscriminately arrest demonstrators and Legal Observers without probable cause and swear out false complaints).

   b. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony

      i.  in order to protect other officers; and/or

      ii.  in order to chill activity or associations protected by the First Amendment;

  c.  Failing to supervise, train, instruct and discipline police officers and encouraging their misconduct;

  d.  Discouraging police officers from reporting the corrupt or unlawful acts of other police officers;

  e.  Retaliating against officers who report police misconduct.

67. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

  a.  Schoolcraft v. City of New York, 10-cv-6005 (RWS) (S.D.N.Y.) (police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

  b.  Long v. City of New York, 09-cv-6099 (AKH) (S.D.N.Y.); People v. Pogan, 06416-2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint and used excessive force is convicted of falsifying police records and was prosecuted for recklessly using physical force; the plaintiff was engaged in expressive conduct, to wit, riding in a Critical Mass bicycle ride, when he was assaulted by the officer);

  c.  Taylor-Mickens v. City of New York, 09-cv-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct);

  d.  Lin v. City of New York, 09-cv-1936 (PGG) (S.D.N.Y.) (officers arrest person lawfully photographing an arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence; officers also arrest a bystander after refusing an unlawful order to produce identification);[4]

  e.  Colon v. City of New York, 09-cv-0008 (E.D.N.Y.)  In an Order dated November 25, 2009, which denied the CITY's motion to dismiss on Iqbal/Twombly grounds, wherein the police officers at issue were fired and prosecuted for falsifying evidence

---

[4]    For a description of this case and settlement, *see*, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists*, N.Y. Times, March 30, 2010, *available at* http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/.

in a purported buy-and-bust operation, the Honorable District Court Judge Weinstein wrote:

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officer of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration – through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department – there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

f.   Bryant v. City of New York, 22011/2007 (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);[5]

g.   Callaghan v. City of New York, 07-cv-9611 (PKC) (S.D.N.Y.) (officers accused of falsifying evidence and retaliatory arrests of bicyclists engaged in expressive conduct, to wit, riding in Critical Mass bicycle rides after the 2004 Republican National Convention);[6]

h.   Williams v. City of New York, 06-cv-6601 (NGG), 2009 U.S. Dist. LEXIS 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on the premises);

i.   Dunlop v. City of New York, 06-cv-0433 (RJS), 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y.) (bystander arrested outside the 2004 Republican National Convention while observing arrests occurring in public; alleges that police destroyed exculpatory evidence by deleting portions of a video which contradict sworn criminal complaint);

j.   Carmody v. City of New York, 05-cv-8084 (HB), 2006 U.S. Dist. LEXIS 83207 (S.D.N.Y.) (police officer alleges that he was terminated for cooperating with another officer's claims of a hostile work environment);

k.   MacNamara v. City of New York, 04-cv-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by officers to attempt to cover-up

---

[5]   For a description of this case and ultimate settlement, see, Oren Yaniv, *Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/02/19/2011-02-19_court_rules_that_cops_do_use_quotas_woman_injured_in_2006_arrest_settles_for_750.html.

[6]   For a description of this case and the nearly $1 million settlement, *see*, Cate Doty, *Bike Riders in New York Win Settlement*, N.Y. Times, October 18, 2010, *available at* http://www.nytimes.com/2010/10/19/nyregion/19critical.html?_r=1.

or justify unlawful mass arrests of approximately 1800 in the consolidated litigation arising out of the 2004 Republican National Convention);

l. McMillan v. City of New York, 04-cv-3990 (FB) (RML) (E.D.N.Y.) (officers fabricated evidence and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

m. Avent v. City of New York, 04-cv-2451 (CBA) (CLP) (E.D.N.Y.) (same);

n. Smith v. City of New York, 04-cv-1045 (RRM) (JMA) (E.D.N.Y.) (same);

o. Powers v. City of New York, 04-cv-2246 (NGG), 2007 U.S. Dist. LEXIS 27704 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

p. Kunstler v. City of New York, 04-cv-1145 (RWS) (MHD) (S.D.N.Y.) (group of peaceful anti-war protestors arrested without probable cause and questioned by NYPD about their political beliefs; photographic and video surveillance of the protestors taken due to plaintiff's political beliefs);

q. Dotson v. City of New York, 03-cv-2136 (RMB) (S.D.N.Y.) (officers arrest and use excessive force against a candidate for City Council for trespassing in his own residential building);

r. Richardson v. City of New York, 02-cv-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, and used excessive force against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

s. Barry v. New York City Police Department, 01-cv-10627 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

t. Taylor v. City of New York, 01-cv-5750 (ILG) (MDG) (E.D.N.Y.) (same as Richardson, except without the excessive force; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified); and

u. Kaufman v. City of New York, 87-cv-4492 (RO), 1992 U.S. Dist. LEXIS 14049 (S.D.N.Y.) (bystander arrested for observing an unlawful arrest in public, requesting the officer's badge number, and telling the officer that he planned to file a report about the arrest).

68. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct**, are further evidenced, <u>inter alia</u>, by the following:

    a. The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

> In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate that the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted – especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resources anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority – which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[7]

    b. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

    c. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in <u>Colon v. City of New York</u>, 09-cv-00008 (E.D.N.Y.), in which he noted a "widespread... custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, then-NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[8]

---

[7]    Mollen Commission Report, pp. 2-3, *available at* http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf.

[8]    Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, *available at* http://www.nydailynews.com/news/ny_crime/2009/12/02/2009-12-02_kelly_shrugs_off_judge_who_rips_lying_cops.html.

d.  Regarding defendant CITY's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a CITY agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[9] When it does, however, the Police Commissioner controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Commissioner Kelly's tenure, only one-quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[10] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[11]

69. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence**, are further evidenced, inter alia, by the following:

a.  The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system.  It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or

---

[9]  In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%).  In 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about 5%).  *See*, CCRB Jan.-Dec. 2007 Status Report at p. 19, *available at* http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf.  Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[10]  Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19.

[11]  Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

should have known about falsified versions of searches and arrests and never questioned them.[12]

[...]

What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[13]

b. In June of 2011, in the case in New York County Supreme Court entitled People v. William Eiseman (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[14]

c. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released.[15] Moreover,

Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

---

[12]    Mollen Commission Report, p. 36.

[13]    Mollen Commission Report, pp. 40-41.

[14]    Melissa Grace, *NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal*, N.Y. Daily News, June 27, 2011, *available at* http://www.nydailynews.com/news/ny_crime/2011/06/27/2011-06-27_nypd_ sgt_william_eiseman_pleads_guilty_to_lying_under_oath_in_plea_deal.html.

[15]    Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009, *available at* http://www.nypost.com/p/news/local/nypd_in_liar_storm_qazMBEm3UNJVogv4NdeqcI.

That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

Their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports.[16]

d.  In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted of those offenses. The 109th Precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's Office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th Precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States Attorney Monica Ryan, members of the 109th Precinct "maintained a small stash of drugs in an Altoids tin for this purpose."[17]

e.  In December of 2009, two (2) officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Some time later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.

---

[16]    *Id.*

[17]    John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at* http://www.nydailynews.com/news/ny_crime/2008/06/20/2008-06-20_claims_of_corruption_at_queens_precinct_.html.

[Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.

Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.

To complete the ruse, the undercover cop was processed at the station house so as to not tip off Stukes and Tirado about the sting…

[P]olice sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

"There's pressure on the cops from the bosses and they're getting pressured from headquarters," a police source told The Post.[18]

The officers were indicted for felony perjury, filing a false report and filing a false instrument.[19]

f.   In early 2010, the CITY settled a civil rights lawsuit wherein one Officer Sean Spencer[20] falsely arrested and accused a 41-year old grandmother of prostitution, promising to pay the woman $35,000.   In court documents, Caroline Chen, the attorney representing the CITY in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense."[21]

g.   Separate grand jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking into drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by New York Newsday said they believe those two grand jury investigations - in the 46th Precinct in the University Heights section of the

---

[18]      Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at* http://www.nypost.com/p/news/local/brooklyn/cops_sting_cops_lyItuTeLedhKWtruJZYsdL.

[19]      John Marzulli, *Brooklyn cops charged with barding into sting operation, arresting a fellow officer on bogus charges*, N.Y. Daily News, July 30, 2010, available at http://www.nydailynews.com/ny_local/2010/07/30/ 2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[20]      In sum, the CITY has paid out $80,000 to settle four (4) federal lawsuits against Officer Sean Spencer. John Marzulli, *City shells out $35G to grandmother, Monica Gonzalez, busted as hooker*, New York Daily News, January 7, 2010, available at http://www.nydailynews.com/ny_local/2010/01/08/2010-01-08_city_shells_ out_35g_to_granny_busted_as_hooker.html.

[21]      *Id.*

Bronx and the 34th Precinct - are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[22]

70. The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, <u>inter alia</u>, by the following:

    a. Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

    b. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

    c. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced every day in every way."

71. The existence of the above-described unlawful <u>de facto</u> policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including without limitation then-Commissioner Kelly.

72. The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned <u>de facto</u> policies and/or well-settled and widespread customs and practices of the CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates. They did so with the knowledge and approval of their supervisors,

---

[22]    David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, others say department overlooks corruption*, New York Newsday, November 18, 1991, at 6.

commanders and then-Commissioner Kelly who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, <u>inter alia</u>, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

73. All of the foregoing acts by defendants deprived Ms. MELTZER-COHEN of federally protected rights, including, but not limited to, the constitutional rights enumerated in paragraph "60" above.

74. The CITY knew or should have known that the acts alleged herein would deprive Ms. MELTZER-COHEN of her rights under the First, Fourth and Fourteenth Amendments to the United States Constitution.

75. The CITY is directly liable and responsible for the acts of the officer-defendants because it repeatedly and knowingly failed to properly supervise, train, instruct and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and NYPD, and to require compliance with the Constitution and laws of the United States.

76. Despite knowledge of such unlawful <u>de facto</u> policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including then-Commissioner Kelly, did not take steps to terminate these policies, practices and/or customs, did not discipline individuals who engaged in such polices, practices and/or

customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanctioned and ratified these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

77. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, the officer-defendants felt empowered to arrest Ms. MELTZER-COHEN without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Ms. MELTZER-COHEN's constitutional rights.

78. Ms. MELTZER-COHEN's injuries were a direct and proximate result of the CITY and the NYPD's wrongful de facto policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the CITY and the NYPD to properly supervise, train and discipline their police officers.

79. Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate police officers and were directly responsible for the violation of the Ms. MELTZER-COHEN's constitutional rights.

## JURY DEMAND

80. Plaintiff demands a trial by jury in this action on each and every one of her damage claims.

*WHEREFORE*, Ms. MELTZER-COHEN demands judgment against the defendants individually and jointly and prays for relief as follows:

a. That she be compensated for violation of her constitutional rights, pain, suffering, mental anguish and humiliation; and

b.   That she be awarded punitive damages against the officer-defendants; and

c.   That she be compensated for attorneys' fees and the costs and disbursements of this action; and

d.   For such other further and different relief as to the Court may seem just and proper.

Dated:       New York, New York
             January 27, 2014

                                   Respectfully submitted,

                          By:   _____
                                   Robert M. Quackenbush
                                   Rankin & Taylor, PLLC
                                   *Attorneys for the Plaintiff*
                                   11 Park Place, Suite 914
                                   New York, New York 10007
                                   t: 212-226-4507